UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 07-131 (PAM/JSM)

      Plaintiff,

v.                                           <u>REPORT AND RECOMMENDATION</u>

JOSE ELIAS MACEO-SOTO,

      Defendant.

JANIE S. MAYERON, U.S. Magistrate Judge

    The above matter came on for hearing before the undersigned upon Jose Elias Maceo-Soto's Motion to Suppress Evidence Seized Without a Warrant [Docket No. 15] and Motion to Suppress Evidence Seized Without a Warrant [Docket No. 20].  Andrew S. Dunne, Assistant United States Attorney, appeared on behalf of the United States of America; Maria K Woroby, Esq., appeared on behalf of the defendant, Jose Elias Maceo-Soto, who was personally present.  The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

    Based upon the pleadings, the pre-hearing submissions, exhibits submitted at the hearing on July 23, 2007, and testimony taken from Special Agent Lance Swanson and Agent Ulrich Palmer-Denig, it is recommended that the Jose Elias Maceo-Soto's Motion to Suppress Evidence Seized Without a Warrant [Docket No. 15] and Motion to Suppress Evidence Seized Without a Warrant [Docket No. 20] be **DENIED**.

## I.    FACTUAL BACKGROUND

At the hearing on July 23, 2007, Special Agent Lance Swanson, of the Diplomatic Security Service, Department of State, testified that in December of 2006, he was referred an investigation regarding the potential fraud in a passport application under the name of Juan Ricardo Maldonado Carattini ("Carattini").  Tr. 13-15.  The documents submitted by the applicant included a Puerto Rican birth certificate and a Minnesota driver's license under the applicant's name of Carattini.  Tr. 16.  A copy of the birth certificate was faxed to the Puerto Rican Department of Health, which sent back information regarding the parents and siblings associated with the named individual on the birth certificate.  Id.  Agent Swanson also verified the Minnesota driver's license submitted as part of the application with the Minnesota Driver's License Division.  Tr. 17.  The photograph on record was the same as the photograph in the passport application.  Id.  Further, as part of his investigation, Agent Swanson traveled to Minnesota, in March of 2007, to interview Carattini. Tr. 17-18.  Once in Minnesota, Agent Swanson met up with Agent Ulrich Palmer-Denig, from Immigration and Customs Enforcement ("ICE"), who assisted him with the investigation of the potentially fraudulent passport application.  Tr. 18-19.  The agents reviewed the case, and discovered a different Minnesota driver's license with the applicant's picture on it, but in the name of Giovanni Francesco Fraguada ("Fraguada").  Tr. 19-20.

On March 21, 2007, agents located defendant at the resident listed on his Minnesota diver's license.  Tr. 20-21.  When Agents Swanson and Palmer-Denig first approached the individual they believed was Carattini, he was sitting on the stoop or front porch of the residence.  Tr. 22, 41, 52.  Agents Swanson and Palmer-Denig

testified that they approached defendant, identified themselves, and asked if they could go inside of his house and speak, so that they would not be publicly sharing his business with the entire neighborhood.  Tr. 22, 42.  Defendant said they could, and then led them inside the residence.  Tr. 22, 42.  Defendant asked the agents to sit down in the living room, and Special Agent Swanson asked if they could find a place that was more private, given there were three younger children in the living room watching a children's program.  Tr. 22, 42.  Defendant motioned the agents towards the kitchen.  Tr. 22, 42.  The kitchen had two open doorways.  Tr. 24.  One led to the family room, and the other led down to the back doorway and basement of the residence.  Tr. 23-24.

When the interview began, Agents Swanson and Palmer-Denig were sitting with defendant at a round kitchen table, with two other agents standing next to the kitchen doorway leading to the living room[1] for officer safety, as the agents did not know who was in the residence.  Tr. 23-24, 37, 43.  Agent Swanson stated that he advised defendant that the agents were not there to arrest him, only to interview him about his passport application.  Tr. 24, 28-29, 45, 60.  Defendant indicated to Special Agent Swanson that he understood this.  Tr. 25.  Defendant was not told that he could leave at any time, however, Agent Palmer-Denig testified that defendant was free to go at any time and that if defendant had told him he did not want to be interviewed, the agents would have left.  Tr. 60-62.  According to Agent Palmer-Denig, defendant was not given his Miranda rights prior to the interview because it was not a custodial interview, given that the agents were not certain that any violation had taken place.  Tr. 61.  The interview lasted approximately 15 to 20 minutes.  Tr. 34, 49.

---

[1]     There were a total of four agents in the house at the time of the interview.  Tr. 59.

Special Agent Swanson characterized the tone of the interview as normal and relaxed.  Tr. 28.  No threats were made either before or during the interview.  Id.  In addition, Agent Palmer-Denig testified that defendant was not handcuffed during his interview.  Tr. 58.  At one point during the interview, defendant got up to get a drink of water.  Tr. 29, 44.  Further, Special Agent Swanson testified that people were walking through the house during the interview and walking in and out of the kitchen through the back door way, including defendant's brother, which caused the agents to post an agent in the landing next to the outside door for officer safety.  Tr. 24, 29, 38, 60.  According to Special Agent Swanson, the posted agent did not stop anyone.  Tr. 38.

During the interview, defendant pulled out three forms of identification: a Minnesota driver's license card; a labor union card; and a copy of a social security card. Tr. 25, 45.  All three identification cards had the Carattini name on them.  Id.  In addition, defendant identified himself as Carattini.   Tr. 25.   Defendant also acknowledged he had submitted a passport application.  Id.  Defendant denied that he had ever used any other name.  Tr. 46.  Special Agent Swanson then went over the Puerto Rican birth certificate with defendant.  Tr. 26.  Specifically, defendant was asked about his parents and siblings.  Id.  Defendant gave the wrong name for his mother.  Id. He also claimed he had one sibling, when in fact the Puerto Rican Health Department provided that the individual on the birth certificate had three siblings.  Id.  Defendant also gave the wrong name of the one sibling he identified.  Id.  At that point, Special Agent Swanson testified that he confronted defendant about the two Minnesota Driver's licenses with the different names of Carattini and Fraguada.  Tr. 27.  Defendant initially conceded that the picture on the driver's license was of him, but that he never used the

name of Fraguada.  Tr. 46.  Agent Palmer-Denig testified that they then spent a couple of minutes talking about telling the truth, that the agents were trying to be straight with him, and that everyone in the room knew the truth about whether that he applied for the Fraguada license.  Tr. 47.   Defendant subsequently admitted that photograph on the Fraguada license was him, and that this was his identification card.  Tr. 27, 47.  He also told the agents that he had been using the fake Carattini identity to work in the United States, that his real name was Giovanni Francesco Fraguada, and that he been born in the Dominican Republic.  Tr. 27-28, 47.  It was at this point, that Special Agent Swanson decided to arrest defendant.  Tr. 28-29.  Defendant was taken  to the ICE office in Bloomington, Minnesota.  Tr. 29.  After his arrest, transfer and processing, defendant was advised of his <u>Miranda</u> rights.  Tr. 29-30.  Defendant asked for an attorney, and all questioning ended at that point.  Tr. 30.

Defendant now moves the Court to suppress the statements that he made during the March 21, 2007 interview.[2]

## II.   ANALYSIS

Defendant seeks suppression of his statements made at the  March 21, 2007 interview based on his argument that because he was in the custody of law enforcement when he was subjected to interrogation, he was entitled to advisement of his <u>Miranda</u> rights.  The Government argues that defendant was not in custody during the interrogation and therefore was not entitled to <u>Miranda</u> warnings.

---

[2]     While both of defendant's dispositive motions were captioned as motions to suppress evidence, defendant's counsel represented at the hearing that the motions sought to suppress statements and answers made by her client during his questioning. Tr. 5.

Miranda v. Arizona requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). Therefore, the protections afforded by Miranda are triggered when an individual "is both in custody and being interrogated." United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.), cert. denied, 503 U.S. 1011 (1992)).  "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

When determining whether a suspect is in custody, courts consider the following six "indicia of custody":

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during the questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated;  and

(6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349; see also, e.g., United States v. Axsom, 289 F.3d 496 (8th Cir.

2002).  The first three factors are considered "mitigating factors" which, if found, tend to

show that the suspect was not in custody.  Griffin, 922 F.2d at 1349.  The remaining

three factors are characterized as "coercive factors" which, if found, tend to show the

existence of custody.  Griffin, 922 F.2d at 1349.

The determination of whether an individual is in custody at a particular time

depends on "the extent of the physical or psychological restraints placed on the suspect

during interrogation in light of whether a 'reasonable person in the suspect's position

would have understood his situation' to be one of custody."  Griffin, 922 F.2d at 1347

(quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  Moreover, the determination

is based on the totality of the circumstances, with none of the factors being dispositive,

and a particularly strong showing on one factor may compensate for a deficiency on

another factor.  Griffin, 922 F.2d at 1347.  The ultimate inquiry is whether there was a

formal arrest or restraint on defendant's movement of the degree associated with a

formal arrest.  Stansbury v. California, 511 U.S. 318, 322 (1995); see also United States

v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005) ("The ultimate inquiry to determine

custody for Miranda purposes is whether there was a formal arrest, or restraint on

freedom of movement of the degree associated with a formal arrest.").  However,

Miranda warnings are not required merely because law enforcement officers question

an individual who they suspect committed a crime.  See United States v. Leese, 176

F.3d 740, 744 (3rd Cir. 1990) (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

Based on the totality of the circumstances, the Court finds that defendant was not

in custody during the interview on March 21, 2007.  The first of the six indicia of custody

is whether the suspect was informed that questioning was voluntary and was told that he was not under arrest.   According to the agents, defendant was advised that they were not there to arrest him, only to interview him about his passport application.   Tr. 24, 28-29, 45, 60.   While not specifically told by the agents that the interview was voluntary, Agent Palmer-Denig testified that he and Special Agent Swanson asked defendant "if he would be willing to talk to us."   Tr. 42 (emphasis added).   This Court finds that this inquiry sufficiently communicated to defendant that the interview was voluntary, as he did not have to speak with the agents if he did not want to.   As such, this indicates that defendant was not in custody.

With respect to the second factor, the defendant was not restrained in any manner during the interview.   Agent Palmer-Denig testified that defendant was not handcuffed during his interview.   Tr. 58.   At one point during the interview, defendant got up to get a drink of water.   Tr. 29, 44.   Defendant's assertion that federal agents blocked the doorway to the kitchen and back door leading out to the backyard, is not supported by the evidence.   See Memorandum in Support of Motion to Suppress Statements, Admissions and Answers at p. 3.   The testimony was that one agent stood next to the doorway to the living room, another agent stood on the landing leading to back door of the residence for officer safety, and people were passing unimpeded through the kitchen during the interview.   Tr. 23-24, 29, 37-38, 60.   The second factor therefore suggests that defendant was not in custody.

The third factor for consideration, whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions, also weighs against a finding of custody.   When Agents Swanson and Palmer-Denig first

approached defendant, he was sitting out in public on the stoop of the residence.  Tr. 22, 41, 52.   Agents Swanson and Palmer-Denig testified that they approached defendant, identified themselves, and asked if they could go inside of the house and speak.  Tr. 22, 42.  Defendant said they could and then led the agents inside the residence.  Tr. 22, 42.  Although defendant did not initiate the interview, he voluntarily answered the questions of the officers and permitted himself to be interviewed.  Tr. 22, 42.  As such, the third factor weighs against a finding that defendant was in custody.

With respect to the fourth factor, Special Agent Swanson characterized the tone of the interview as normal and relaxed.  Tr. 28.  At most, the agents spoke to defendant about the importance of being truthful.  Reminding an interviewee of his obligation to be truthful does not constitute strong-arm tactics or deception.   Because there is no evidence that the interviewing officers employed any strong-arm tactics or deceptive strategies, the fourth factor suggests that defendant was not in custody.

Regarding the fifth factor, the atmosphere could be considered to be dominated by law enforcement, if only because there were four officers in the immediate vicinity of defendant during the interview.  However, the interview took place at the defendant's residence, the defendant moved around, there were three children in the adjoining living room, and other individuals, including defendant's brother, walked through the kitchen during the interview.  Tr. 22, 29, 38, 42, 44, 60.  Therefore, although there were four officers and defendant in the vicinity of the kitchen, the atmosphere was not so police-dominated as to warrant a finding that defendant was in custody.  See Axsom, 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial.").

Finally, as to the sixth factor, defendant was placed under arrest at the conclusion of the interview.  This weighs in favor of a finding of custody.  However, as stated previously, none of the six "indicia of custody" are exclusive in of themselves. United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (citing United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004)).  Therefore, this Court cannot make a finding that defendant was in custody during his interview solely because he was formally arrested after the interview.

In light of the totality of the circumstances in this case, the Court finds that a reasonable person in defendant's position would not have believed that he or she was in custody at the time of the interview.  Therefore, the Court concludes that defendant was not in custody during the interview at his residence on March 21, 2007.  As such, he was not entitled to Miranda warnings and his motion to suppress statements made during the March 21, 2007 interview should be denied.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that:

1.    Jose Elias Maceo-Soto's Motion to Suppress Evidence Seized Without a Warrant [Docket No. 15] be **DENIED**; and

2.    Jose Elias Maceo-Soto's Motion to Suppress Evidence Seized Without a Warrant [Docket No. 20] be **DENIED**.

Dated:       August 24, 2007


s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **September 4, 2007**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.